Electronically Filed
1/16/2025 6:05 PM
Steven D. Grierson
CLERK OF THE COURT

1    **COMPB**
Robert J. Cassity
2    Nevada Bar No. 9779
Joseph G. Went
3    Nevada Bar No. 9220
Sydney R. Gambee
4    Nevada Bar No. 14201
Caitlan J. McMasters
5    Nevada Bar No. 16595
**HOLLAND & HART LLP**
6    9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
7    Phone: 702.669.4600
Fax: 702.669.4650
8    bcassity@hollandhart.com
jgwent@hollandhart.com
9    srgambee@hollandhart.com
cjmcmasters@hollandhart.com
10

*Attorneys for Energy Enhancement*
11    *System, LLC, Michael Bertolacini,*
*and Dr. Sandra Rose Michael, DNM*
12

**CASE NO: A-25-910216-B**
**Department 16**

**DISTRICT COURT**

13

**CLARK COUNTY, NEVADA**

14

ENERGY ENHANCEMENT SYSTEM, LLC,     Case No.
15    a Nevada limited liability company;
MICHAEL BERTOLACINI, an individual;     Dept. No.
16    DR. SANDRA ROSE MICHAEL, DNM, an
individual;
17

           Plaintiffs,
18

v.
19

JASON SHURKA, an individual; UNIFYD
20    WORLD, INC., a South Carolina corporation;
UNIFYD Healing; UNIFY TV; ROBERT
21    RELIGA, an individual; DOES I-X; and ROE
CORPORATIONS XI-XX,
22

           Defendants.
23

**COMPLAINT**

**BUSINESS COURT REQUESTED**

**EXEMPT FROM ARBITRATION:**
**BUSINESS COURT MATTER;**
**INJUNCTIVE RELIEF REQUESTED**

24       Plaintiffs ENERGY ENHANCEMENT SYSTEM, LLC ("EES" or "Company"),

25    MICHAEL BERTOLACINI ("Bertolacini"), and DR. SANDRA ROSE MICHAEL, DNM ("Dr.

26    Michael," collectively, "Plaintiffs"), by and through undersigned counsel, file this Complaint

27    against Defendants JASON SHURKA, an individual ("Shurka"), UNIFYD World, Inc., a South

28    Carolina corporation ("UW"), UNIFYD Healing ("UH"), UNIFY TV ("UTV") (collectively,

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

"UNIFYD"), and ROBERT RELIGA, an individual ("Religa" and together with UNIFYD, "Defendants"), and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.  EES is a Nevada limited liability company and registered to do business in Clark County, Nevada.

2.  Bertolacini is an individual who resides in the state of Nevada.

3.  Dr. Michael is an individual who resides in the state of Nevada.

4.  Shurka is an individual who resides, on information and belief, in the state of Florida.

5.  UW is a corporation organized under the laws of the state of South Carolina as a non-profit and registered to do business in Florida.

6.  Upon information and belief, UH and UTV are affiliates of Shurka and UW.

7.  Upon information and belief, Religa is an individual who resides in the state of California.

8.  Defendants Does I through X and Roe Corporations XI through XX are persons or entities whose acts, activities, misconduct or omissions make them jointly and severally liable under the claims for relief as set forth herein. The true names and capacities of the Doe Defendants and Roe Corporate Defendants are presently unknown, but when ascertained, Plaintiffs request leave of the Court to amend the Complaint to substitute their true names and capacities.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction pursuant to Article VI of the Nevada Constitution, and personal jurisdiction over the Defendant in accordance with NRS 14.065, on the grounds that such jurisdiction is not inconsistent with the Nevada Constitution or the United States Constitution.

10.  Specifically, Defendants' actions and communications were directed at EES via Bertolacini, a Nevada resident.

11.  Additionally, a Nevada limited liability company suffered the harm detailed herein.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

12.     The matter in controversy exceeds the minimum jurisdictional amount of this Court. In addition, the Court has subject matter jurisdiction because the action seeks injunctive relief.

13.     Venue is proper in the Eighth Judicial District Court in accordance with NRS 13.010 and NRS 13.040.

## GENERAL ALLEGATIONS

**A.     Background of EES and the EESystem.**

14.     EES was co-founded by Dr. Michael and Bertolacini and is currently operated by Chief Executive Officer, Bertolacini.

15.     Dr. Michael researched and developed technology that was ultimately incorporated into the Energy Enhancement System (EESystem), which EES develops and sells to its customers across the globe.

16.     The EESystem utilizes the revolutionary technology researched by Dr. Michael to improve the wellness of the customers who use it.

17.     The EESystem enhances the environment of the rooms in which it is placed by charging the air with non-linear and photonic energy waves.

18.     The EESystem is designed to generate bio-active life enhancing energy fields, including "scalar waves."

19.     Customers may experience improved cell regeneration, improved immune function, relief from pain, detoxification of the body, elevated moods, increased energy levels, and other benefits.

20.     The EESystems can be installed and customized to a variety of spaces, including at meditation and wellness centers that make the use of the EESystems available to the public as a wellness service (the "Centers").

21.     EESystems have been installed throughout the United States and internationally at various Centers.

**B.     Shurka and UNIFYD**

22.     Shurka is an author and social media influencer who founded UNIFYD.

3

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

23.     Shurka purports to work with an undercover organization known as TLS or The Light System, whose stated goal is "the betterment of humanity."

24.     Shurka is the self-proclaimed spokesperson for TLS.

25.     In or around June 2022, Shurka founded Unifyd Healing and began conducting business as a New York based Private Membership Association.

26.     In or around September 2023, Shurka founded UW as a nonprofit corporation in South Carolina. Upon information and belief, UNIFYD was organized on September 18, 2023 in South Carolina as an "Incorporated Private Ecclesiastical entity, Church/Temple, 508(c)(1(a) Faith Based Organization Ecclesiastical Research/Center."

27.     UW purports to be "a Private Ecclesiastic Entity, Faith Based Organization and Church/Temple."

28.     UTV is a streaming service and/or digital library with content including interviews, television series programs, and "documentaries."

29.     Shurka has participated in various interviews and produced and/or promoted a number of television series programs and "documentaries" that he makes available to watch on UTV.

**C.     EES and Shurka Conduct the Interview.**

30.     Plaintiffs first became aware of Shurka through a mutual acquaintance, Scott McKay.

31.     Mr. McKay hosts online and radio interviews through his brand, Patriot Street Fighter.

32.     On December 22, 2021, Mr. McKay completed an interview at Dr. Michael's residence regarding EES technology.

33.     Also on or about December 22, 2021, Mr. McKay interviewed Shurka remotely, during which interview they referenced EES and Dr. Michael.

34.     Dr. Michael first had direct contact with Shurka in January 2022, when Jason called her to inquire about her background and the details of the EES technology. During the call,

4

Shurka appeared to be skeptical of the EES technology and abrupted ended the call by hanging up when Dr. Michaels referenced The Light System (TLS).

35.     In or around February 2022, Shurka called Dr. Michael representing that he confirmed with TLS that Dr. Michael "was real."  In other words, Shurka had separately confirmed that he could trust Dr. Michael.

36.     Shurka and Dr. Michael met in person for the first time on April 30, 2022, during a conference, Liberti's Horizon, in San Diego, California at which they both made presentations.

37.     Shurka thereafter used EESystem personally and also invited his family members to use the EESystem technology themselves.

38.     Shurka and Shurka's father, Manny Shurka ("Manny"), visited an EES center in New Jersey and brought a family member and pet to the center for multiple sessions.

39.     Meanwhile, Dr Michael agreed to host a 60-person fundraiser for Mr. McKay's Street Fighter cause at her Las Vegas home on May 21, 2022.

40.     Mr. McKay invited Shurka and Manny (the "Shurkas") to the fundraiser.

41.     The day before the fundraiser, on May 20, 2022, Shurka called Dr. Michael asking her to participate in an interview regarding the future of the EESystem.

42.     Shurka did not state where or when the interview would take place, but Dr. Michael indicated that she was willing to participate, and the parties should "see how it works out."

43.     Unexpectedly, Shurka arrived two hours early for the event on May 21, 2022 and stated that he needed to interview Dr. Michael immediately.

44.     While she was surprised by the sudden urgency, Dr. Michael agreed to participate in the interview with Shurka (the "Interview").

45.     The Interview concerned EES and its EESystem, was recorded, and was later uploaded to YouTube.

46.     Bertolacini arrived at Dr. Michael's residence and helped Shurka set up and prepare for the interview.

47.     Bertolacini first met Shurka at the Interview at Dr. Michael's home.

5

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

48.     The Interview was disseminated broadly online on May 27, 2022.

49.     In the Interview, Shurka connected EES to TLS and broadly used his role as the stated spokesperson for TLS to promote EES and the EESystem.

50.     For instance, in the Interview, Shurka references that Dr. Michael had also been approached by TLS in 2011, and that it was TLS that encouraged Shurka to inquire about EES and the EESystem.

51.     The Interview was widely viewed and generated significant interest in EES's products.

52.     Indeed, the success of the Interview and the substantial leads generated from it in such a short period of time reinforced Shurka's self-proclaimed connection to a more powerful organization: TLS.

53.     Bertolacini therefore believed that Shurka was actually associated with TLS and that TLS was a powerful organization that had taken up an interest in EES's success.

**D.     The Oral Agreement Between EES and Defendants.**

54.     Capitalizing on the publicity from the Interview, in June 2022, Shurka pitched an idea to Bertolacini to create a marketing partnership, or "promotion leg," for owners of Centers that purchase EES products.

55.     The promotion leg was pitched by Shurka as a way to support the Centers with their own marketing to generate leads for customers who would patronize the Centers to use their products, including the EESystem.

56.     Shurka told EES that this promotion leg would be supported by UH, another affiliate of Shurka and his organization.  Thus, UH would provide marketing support for Centers who purchased EES products.

57.     Shurka represented that his UNIFYD platform would help EES grow exponentially, necessarily implying that UNIFYD, itself, was a thriving business.

58.     Based on EES's success following the Interview, Shurka's apparent ties to TLS, and Shurka's representations that a partnership between UH and EES would only lead to more success for the companies, in or around June 2022, EES verbally agreed to support UH's effort

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

6

to start UH, where UH would market and provide support to the Centers and EES allowed UH to solicit such marketing arrangements with the Centers (the "EES-UH Original Agreement," and together with all amendments as further described herein the "Oral Agreement").

59.     UH describes itself as in "direct collaboration with EESystem," coming "together to spread awareness of the incredible Energy Enhancement System (EESystem)."

60.     UH sells its marketing services to Centers, promising to provide "local ads, public relation campaigns, and resources to shine a light within your community."

61.     UH describes its role as "hand-in-hand" with a Center's "endeavor to purchase an EESystem."

62.     In August 2022, Shurka told Bertolacini that he was having trouble getting traction with selling UH's marketing services to Centers because he had little to offer them other than making YouTube videos.

63.     Shurka asked Bertolacini if he could grant a 10% discount on EESystems sold to UH members, to encourage Centers to engage UH for marketing services.

64.     EES agreed to Shurka's request and agreed, for a limited period of time, to sell its EESystems to Centers for a 10% discount if those Centers also agreed to enter into a contractual arrangement with UH whereby UH would receive payments from the Centers in exchange for providing marketing services to the Centers.

65.     Under the arrangement, a new center that purchased an EESystem and also agreed to procure marketing services from UH (a "UH Center") would receive the EESystem at 90% of MSRP from EES and sign a contract for marketing services with UH (the "EES-UH First Amended Agreement").

66.     This EES-UH First Amended Agreement did not require any exchange of monetary consideration between UH and EES.

67.     Rather, UH would market for sales of EESystems, which EES would sell at 90% of MSRP and keep the sales proceeds, and UH would enter into a contractual relationship with the UH Center for marketing services (which contractual relationship was a mandatory condition

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

7

for the UH Center to receive the 10% discount), with all proceeds under that contract to be retained by UH.

68.     UNIFYD's agreements with the Centers are referred to as "UNIFYD Healing / Center Portal Mobile App Terms and Conditions," "UNIFYD HEALING A Private Ecclesiastic Research Project by UNIFYD WORLD TERMS AND CONDITIONS/AGREEMENT," and/or "UNIFYD WORLD's UNIFYD HEALING Private Ecclesiastic Agreement" (referred to herein as "Center Agreements"). UW is the party to the Center Agreements.

69.     The Center Agreements purport to require Centers to agree to the terms of the Center Agreements to post links to and from UH platforms or websites, in exchange for "donations," "contributions," and "good-will offerings."

70.     The Center Agreements state that such "renumeration" is "not a monetary exchange such as that which exists in a fee for service agreement."

71.     Only UNIFYD[1] benefits from the Center Agreements by receiving monthly contributions from the Centers.

72.     EES does not receive any compensation under the Center Agreements.

73.     This EES-UH First Amended Agreement did not preclude EES from selling its EESystem and other products directly to Centers without UH involvement.

74.     Between August 2022 and February 2024, UNIFYD operated the promotion leg with full autonomy, with no involvement, oversight or management from EES.[2]

75.     Upon information and belief, during this period, UNIFYD signed Center Agreements with more than 350 Centers.

76.     Upon information and belief, under these Center Agreements, UNIFYD would receive a monthly payment from each UH Center averaging $1,000 per month.

---

[1] While EES originally understood UH to be the entity marketing for Centers, it appears that the Center Agreements are with UW, a nonprofit corporation. Thus, throughout this Complaint, references may be to the overall UNIFYD umbrella, and this Complaint may later be amended as further factual detail is uncovered to each particular company's specific involvement.

[2] EES did require, however, that UNIFYD not market EESystem as a medical product or device. The same is required of the Centers.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

77.     Also, at Shurka's request during this period, EES provided 27 EESystems with a value of approximately $1.6 million, free of charge or highly discounted, to Shurka to give away to his family and to use as promotional giveaways to influencers and supporters, in furtherance of the marketing campaign.

78.     Meanwhile, during this period, at Shurka's request, EES provided $225,000 to UH to be used for endorsements, influencer interviews, and what EES believed to be a Shurka-backed Israeli charity.

79.     Beginning in January 2024, however, EES received numerous complaints from UH Center owners that they did not see value in renewing their Center Agreements with UH because they were not receiving adequate sales leads to fill their capacity at the Centers. In other words, these Center owners expressed dissatisfaction to EES with UH's performance under the Center Agreements.

80.     Meanwhile, on February 15, 2024, Bertolacini received a letter via Shurka that was purported to be authored by "Dee" with TLS, threatening that EES's business would fail unless EES (1) made the sales of all of its own EESystems contingent upon the Centers entering into Center Agreements with UH, (2) anointed Shurka as the exclusive spokesperson for EES, and (3) committed to fund to UH $1 million per month for marketing and research for 12 months, a commitment of $12 million over one year (the "February Letter").

81.     While EES believed the February Letter was written by TLS at the time, EES now understands that the February Letter was authored by none other than Shurka himself.

82.     Fearing that TLS would act on its threat and "kill" EES's thriving business, EES capitulated to the demands of the February Letter.

83.     In accordance therewith, on February 23, 2024, Shurka released a joint press release indicating that UH and EES will be "working more closely together to align our unique strengths as a team" (the "Press Release").

84.     The Press Release indicated that EES had pledged $12 million to be spent over the next 12 months, with 90% going towards marketing and 10% to research.

85.     The Press Release also mandated that all future potential Centers must "go through UNIFYD healing to streamline the process and reach our collective goal."

86.     To convince new and existing Centers to enter into Center Agreements with UH, the Press Release stated that EES would pay significant subsidies on behalf of those Centers in exchange for them entering into Center Agreements, consisting of either 10% discount on the purchase of an EESystem or up to $12,000 for one year of UH services under a Center Agreement, along with other incentives supplied by EES.

87.     The Press Release further provided that 40% of total Center Agreements will go towards paid local ads tracked with quantifiable results (collectively, and together with the $12 million pledged spend, requirement for new Centers to "go through UNIFYD healing," subsidies and incentives, and other amendments, the "EES-UH Second Amended Agreement").

88.     Bertolacini voiced concern over the content of the Press Release, and prior to its publication, Bertolacini asked that the Press Release not contain specific monetary figures "committed" to ad spend and research, but Shurka disregarded Bertolacini's input and issued the Press Release with the objectionable content.

89.     When Bertolacini later questioned Shurka regarding the questionable and objectionable content, Shurka stated the content was included because TLS mandated it.

90.     Fearing again for the health of the EES business and trusting that Shurka was truthfully telling him that TLS mandated these changes, Bertolacini did not continue to challenge the content in the Press Release.

91.     As time went on, whenever EES did not immediately accede to Shurka's demands, Shurka invoked the so-called powers and influence at TLS to induce EES to agree to his demands.

92.     To this end, in or around March 2024, EES received a letter from Shurka that was purportedly received by Shurka from TLS (the "March Letter").

93.     While EES believed the March Letter was written by TLS at the time, EES now believes the March Letter was also authored by Shurka.

94.     The March Letter pressured EES to make the Center Agreements mandatory for all sales of EESystems, such that all Centers purchasing products from EES would be required to enter into Center Agreements with UNIFYD.

95.     Additionally, the March Letter stated that EES would fail unless it placed Shurka at the "forefront" of the Company. Correspondingly, EES noticed a decline in sales around the same timeframe.

96.     Based on the March Letter and Shurka's representations that he would devote all monies and resources provided by EES to marketing and support for the Centers, EES agreed to enter into an arrangement with Shurka and UNIFYD to make the Center Agreements mandatory in future sales.

97.     Accordingly, in March 2024, the parties made an official announcement that the parties would be working together "as one" and provided certain incentives for existing Centers not already affiliated with UH to switch to the parties' "collective network," that is, to become UH Centers with UH Agreements with UH (the "EES-UH Third Amended Agreement").

98.     Under the EES-UH Third Amended Agreement, Shurka promised to increase marketing efforts to drive leads to increase sales at the Centers, both for sales of EESystems (benefiting EES) and customer leads for the Centers' services using EES products (benefiting the Centers).

99.     However, months into this EES-UH Third Amended Agreement, Centers began to be increasingly dissatisfied with the marketing efforts of UH and the quality of leads generated, as sales continued to decline.

100.    EES received increased complaints from Centers directly complaining that UH was not responding to their concerns and that they were not receiving the leads or customers expected from the Center Agreements or promised by Shurka and UNIFYD.

101.    Despite EES's continued payment of funds under the EES-UH Oral Agreement, EES later learned that Shurka was devoting substantial sums of money received from EES for marketing his own separate interests in UTV, rather than EES, the EESystem, and the Centers.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

102.   Specifically, EES later discovered that of the approximately $9.4 million Defendants received from EES, at least $1.7 million had been improperly used for UNIFYD's and/or UTV's own benefit.

103.   In or around February 2024, Shurka suggested to Bertolacini that he would create a team of employees within UNIFYD dedicated to work for EES if EES paid funded the team's salaries.

104.   EES agreed and, on or around February 19, 2024, EES began funding portions of UNIFYD's payroll (the "EES-UH Fourth Amended Agreement").

105.   This EES-dedicated team was never fully developed, but Shurka continued to demand payment for the promised services.

106.   On March 15, 2024, Shurka texted Bertolacini regarding staffing changes in UH noting that he was leveraging some staff from UNIFYD TV and making several other changes in IT, and marketing.  Shurka requests Bertolacini to being paying the salaries of the staff involved in the changes and Bertolacini agrees.  The changes result in a $35k per month charge to EES from UH (the "EES-UH Fifth Amended Agreement").

107.   Likewise, Shurka planted his own ally "on the inside" of EES, convincing EES to retain Tamir Malnick ("Malnick") as EES's Chief Financial Officer ("CFO").

108.   Shurka failed to disclose to EES that Malnick is Shurka's childhood friend.

109.   Shurka also failed to disclose that Malnick was also working for Shurka as UH's CFO, an apparent conflict of interest.

110.   In October 2024, Bertolacini learned after confronting Malnick that he is working a dual CFO role for both EES and UH, while EES, alone, was paying Malnick's entire salary for tasks included in his role as CFO for UH.

111.   After identifying this obvious conflict of interest, EES terminated Malnick as CFO for EES in November 2024.

**E.   Shurka's Unsolicited Offer to Sell UH.**

112.   On or around September 3, 2024, Shurka pitched to Bertolacini a sale of UH to EES for $30 million, which unsolicited offer was rejected (the "Sale Offer").

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

113.    On or around September 17, 2024, EES received a letter from UNIFYD purportedly authored by TLS (the "September Letter") encouraging EES to agree to Shurka's terms under the Sale Offer and purchase UH.

114.    Shurka next offered UH to EES (via Bertolacini) for $15 million (the "Second Sale Offer," collectively, the "Sale Offers").

115.    Specifically, on or around October 4, 2024, Shurka made the following proposal to Bertolacini via Whatsapp:

> 15M base
>
> 1. Jason commits to a minimum of 8 events per year wherever desired by EES around the world for a minimum period of 3 years. No compensation except travel expenses covered.
> 2. UNIFYD TV will have a dedicated section in its library for EES technology showcasing any and all podcasts, interviews, etc. for as long as it is under the control of Jason and UNIFYD World.
> 3. Jason will be in an active role for a minimum period of 3 years.
>
> I intend to stay regardless of time limits as I see this as my baby and would always like to be a part of it
>
> Michael will own 100% of Unifyd Healing with full and complete control/voting rights. Jason will receive a performance based benchmark plan.

116.    EES refused the Second Offer.

117.    After this unsolicited Second Offer, Bertolacini began to critically investigate the financial health of UH and the facts and circumstances underlying the Oral Agreement.

118.    On August 21, 2024, Malnick provided P&L statements from UH to Bertolacini as Bertolacini began to question the financial position and history of UH.

119.    The P&L statement shows that UH had retained earnings combined for 2022 through August 31, 2024 of $5.2 million.

120.    As Bertolacini began to question Shurka and UNIFYD's performance under the Oral Agreement and the increased traffic to UNIFYD instead of EES, despite EES having made substantial payments to fund marketing efforts for EES, Bertolacini began receiving letters purportedly from TLS, criticizing Bertolacini for questioning Shurka (collectively, the "Threat

Letters," and together with the February Letter, March Letter, and September Letter, the "Coercion Letters").

121.   The metadata on one such letter sent to EES purportedly from TLS on September 17, 2024 reveals it was authored by none other than Shurka.

122.   At this point, EES began to question TLS's existence and purported involvement with Shurka.

123.   Based on the Coercion Letters, EES had continued its relationship with UNIFYD.

124.   But in continuation of his investigation, Bertolacini discovered via surveys of Center owners that dissatisfaction was prevalent among owners, with 25% positive feedback concerning UNIFYD, 25% negative, and 50% neutral.

125.   Bertolacini further discovered that a significant portion ($1.7 million) of funds spent by EES for marketing services was being spent on UTV, not EES or the Centers.

**F.     Shurka's Shakedown: Demand for EES to Purchase UH for Millions or Suffer the Wrath and Tactical Attacks of Shurka and UNIFYD.**

126.   After the Offers, and after the relationship of the parties had begun to break down due to Bertolacini's investigation, the parties agreed to meet on November 15, 2024 to discuss a potential acquisition of UH's assets, which consisted largely of the Center Agreements, by EES.

127.   EES desired to bring its marketing efforts closer to home, to rectify the poor customer service satisfaction of the Center owners with the marketing service that EES had been convinced to make a mandatory condition of their purchase of EES products.

128.   EES felt a responsibility to protect its brand and its loyal customers from continued exploitation, and EES planned to build out its own home-grown marketing services to better support the Center owners.

129.   During this meeting, EES intended to present EES with a proposal for the purchase of UH's assets, including the Center Agreements.

130.   However, on November 14, 2024, the day before the parties were scheduled to meet, Shurka demanded that Bertolacini have a phone call with Shurka, Manny, and a TLS representative.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

14

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

131.  During this call, the Shurkas made outrageous demands requiring that EES immediately agree to purchase UH for $10,000,000, without any further thought, consideration, or diligence.

132.  The Shurkas refused to allow Bertolacini to even make phone calls to speak with other stakeholders with EES regarding their "proposal."

133.  The Shurkas threatened that if EES refused to agree to their offer and their price during this phone call, then Defendants would launch a full-scale attack against EES, including a massive online smear campaign against EES, along with other attacks designed to destroy EES' reputation, goodwill, and business.

134.  Bertolacini, on behalf of EES, informed the Shurkas that he could not and would not agree to purchase UH on the call, but was considering purchasing UH's assets and that he would have a proposal ready for the parties' originally scheduled meeting the next day.

135.  Consistent with his threats on the phone call, that same night, November 14, 2024, Shurka sent an email to all Centers (the "November 14th Email") making false and disparaging statements regarding EES in retaliation for EES's refusal to pay UH $10 million.

136.  Shurka posted largely the same message on Facebook and on a Change.org petition (the "Social Media Posts"), making false and disparaging statements regarding EES and Bertolacini's family, encouraging the Centers to stop buying products from EES, and starting an online petition seeking to "unite" EES's customers against EES and in favor of Shurka.

137.  The November 14th Email and Social Media Posts contained personal attacks on Bertolacini and Dr. Michael, stating that "the individuals behind the technology are not who they project themselves to be. They are not individuals who do things for humanitarian purposes, especially Michael. They are also extremely disrespectful and ungrateful individuals" and that Andy, EES's new incoming CEO is "a selfish man."

138.  Additionally, the November 14th Email and Social Media Posts contained multiple false statements about EES including, among other things:

    a.  "that EES has decided to open centers without approval/consent from UNIFYD Healing;"

15

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

b.  that EES is "planning to cut off their ad spend for centers worldwide;"

c.  that EES is "currently trying to build out their own version of UNIFYD Healing and take everything for themselves;"

d.  that "EESystem is making a profit margin of up to 400%+ on the merchandise they sell to center owners while making profit margins of up to 1,000% on technology sold to center owners;"

e.  that EES made "$100,000,000 in revenue in less than three years;"

f.  that "EESystem is currently planning to mandate all center owners to pay an annual licensing fee;"

g.  that "EESystem is refusing to pay employees that rendered services for them while also withholding funds from about five center owners that they promised subsidies to as part of the subsidy program established earlier this year"; and

h.  that EESystem was not as advertised and the same products could be purchased elsewhere.

139.    Additionally, the November 14th Email and Social Media Posts contained several links to products of other companies' products that could be mistaken by some as similar to EES's products, stating "here are some links to the same products that you've all been paying a tremendous premium for to help you and your center out on an individual level[.]"

140.    That the products are "the same products" is false.

141.    Shurka also improperly publicized confidential information about the Company's "hyper charged" products, stating:

> For those of you who are concerned about the fact that some products won't be "hyper charged", rest assured that the hyper charger is not what you think it is. A few months ago, I saw it and experienced it (the "new and improved one") on a first-hand basis. *I was asked to ensure that I would not take any photos or videos and never speak a word about it.* I was distraught by what I saw. It is a simple 16-unit EESystem with a copper structure in the middle of the room. In other words, EESystem has been telling us all that only they can hyper-charge their products in order to sell them at a massive premium. None of this is true. They have disempowered the masses in order to create the illusion that the power is not in our hands and we must pay them extra for it. The truth is, you can enhance all of your own products by placing them in the center of

your EESystem. When I learned this, my heart broke. For contractual purposes between you and EESystem, you can simply call your products "scalar enhanced" instead of "hyper charged" to avoid any issues.

(emphasis added).

142.    Additionally, on November 14, 2024, Shurka launched a parallel attack campaign with Center owners through a petition on change.org making certain demands against EES and enlisting Center owners to sign the petition.

143.    207 participants signed the petition and it appears to include family, friends, UH workers and Center owners.

144.    Petion demands included firing of certain EES employees and consultants, mandatory pricing discounts, and other demands.

145.    In the petition, Shurka actively lobbies for a boycott of EES by saying that "in order to guarantee a successful outcome, I ask all of you to stop ordering products from EESystem until they meet our demands."

146.    Upon information and belief, Shurka is using online petitions and social media posts to create artificial support from Center owners to put pressure on EES to feed Shurka's own private aims: an inflated quick payday for Shurka in the form of EES' purchase of UNIFYD's Center Agreements with the very same Center owners who are signing these petitions.

147.    In all "offers" to EES to purchase UH and/or its assets, the Center Agreements, Shurka has made no statements indicating that he would require EES to accede to the "demands" of the Center owners in the online petitions.

148.    Indeed, the petitions are a ruse to pressure EES to accede to Shurka's own financial demands.

149.    Since the November 14 Email and Social Media Posts, at least two customers have cancelled their orders with EES citing the Shurka statements and/or petitions as the reason for the cancellations.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

150.   Additionally, from November 14, 2024 to November 28, 2024, EES experienced a 52% reduction in orders of fulfillment items in net wholesale sales and a 28% reduction in non-wholesale on-line orders resulting in a 40% decrease in net sales.

**G.     Religa's History as a Disgruntled EES Contractor.**

151.   For the first time, Shurka accused EES of "stealing" the technology behind the EESystem from Religa.

152.   Religa worked as an independent contractor software programmer for EES from approximately 1993 to 2002.

153.   At some point, Religa developed the Synchronicity Engine software.

154.   While this Synchronicity Engine software was initially utilized by EES, EES stopped using the software in 2002.

155.   Thereafter, Religa launched a smear campaign against EES requiring multiple cease and desist letters by EES and which ultimately could not be stopped without court intervention.

156.   The Synchronicity Engine software is not associated with the EESystem, and the source code for EESystem does not contain that of Synchronicity Engine software.

**H.     Shurka Retaliates Against EES with Defamatory Claims and, For the First Time, Accuses EES of Not Inventing the EESystem.**

157.   After the November 14 Email and Social Media Posts and despite UNIFYD's threats, EES continued to seek a resolution without Court intervention.

158.   The parties agreed to certain terms for EES's acquisition of UH.

159.   However, on January 14, 2025, Shurka sent EES an email abruptly ending negotiations stating "it has been decided that UNIFYD will no longer be entertaining any form of agreement with EESystem, or any of its subsidiaries/affiliates."

160.   Also on January 14, 2025, Shurka resumed launching additional attacks against EES. Specifically, Shurka publicly posted a defamatory presentation aimed at harming EES and its business relationships with its Centers (the "Presentation").

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

161.    The Presentation again contained numerous personal attacks on Bertalocini and Dr. Michael and made numerous false statements including:

    a.  Putting "Doctor" in quotation marks, implying that Dr. Michael is not actually a doctor even though she is a Doctor of Natural Medine;

    b.  that Dr. Michael "is not the original inventor" of EESystem and, instead, had stolen the invention from Religa and used it for her own benefit;

    c.  that Religa's "Synchronicity Engine" source code is the same as that used by the EESystem;

    d.  that "EESystem's unlicensed use of [Religa's] original copyright has put center owners in jeopardy";

    e.  that "[Dr. Michael's] story of how the [EESystem] technology came to her is fraudulent"; and

    f.  implying that Dr. Michael and EES, along with its products, are somehow personally responsible for Religa's mental health and/or alleged suicide attempts.

162.    Shurka's Presentation also stated that it "is HIGHLY recommended" that new Centers who have recently purchased an EESystem but have not paid their final deposit should cancel their order for a refund.

163.    Consistent with this request, EES has received over $500,000 worth of refund requests since the Presentation was posted.

164.    The Presentation states:

> a deal has been negotiated with Robert J. Regalia to drop his current copyright infringement case with the FBI and provide all current center owners that received their technology from EESystem prior to January 13th, 2025, with his full blessing to continue operating to protect all of the center owners who stepped up to this mission with their hearts in the right place.

(emphasis in original).

165.    Thus, upon information and belief, Shurka is acting on behalf of and with Religa as Religa's agent.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

19

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

166.     Finally, the Presentation presented a "solution" stating that current Center owners "will have the ability, in the near future, to upgrade their softwares [sic] as well" to a "new" version of EESystem purportedly developed by Religa and Shurka called "The Light System" that will be "available for public use at nearly **half the price**." (emphasis in original).

167.     Upon information and belief, Shurka plans to meet with all Center owners to further encourage them to end their relationship with EES and, instead, purchase his "new" (and infringing) The Light System technology.

168.     Shurka also sent EES an email on January 14, 2025 (the "Cease and Desist Email"), purporting to demand that EES "cease and desist from infringing on any and all of [UNIFYD's] private intellectual property including, but not limited to, using any content (interviews, videos, books, testimonials, audio recordings, etc.) inclusive, referring to, or created/facilitated by Reverend Jason Y. Shurka, UNIFYD World Inc., UNIFYD Healing and UNIFYD TV."

169.     The Cease and Desist Email further states:

> As the rightful owner of all [UNIFYD's] private content, as described above, [UNIFYD has] the right to enact a private administrative remedy against Energy Enhancement System LLC if you continue to use any of our content without authorization. These actions, amongst many others, are in violation of the UNIFYD World Inc. terms and conditions signed by Michael Bertalocini on May 23rd, 2023, and if not immediately halted, will result in a private administrative remedy of no less than $100,000,000.

170.     Upon information and belief, the "content" referred to in the Cease and Desist Email is the marketing content paid for by EES and, therefore, is EES's property.

171.     Regardless, upon information and belief, the Cease and Desist Email is yet another attempt for Shurka to shakedown EES and collect as much money from the Company as possible.

172.     Based on Defendants' actions, Plaintiffs have incurred damages and will continue to incur further damages, including without limitation, harm to their reputation and lost sales for EES's products.

**I.     The Sound of Freedom Investment.**

173.     On or around May 29, 2023, Shurka approached EES through Bertolacini to invest in a movie project, Sound of Freedom (the "SOF Investment").

174.     Shurka informed Bertolacini that the Sound of Freedom Movie was seeking to raise additional funding to cover outstanding production costs and in return was offering investors an ownership percentage of the film's net defined proceeds (pari passu) and an executive producer credit.

175.     Because the minimum investment for a membership interest in Sound of Freedom Movie, LLC would be $500,000, Shurka proposed that he and EES split the cost of one membership unit in the project, with each party to invest $250,000.

176.     EES, through Bertolacini, orally agreed to invest $250,000 into the Sound of Freedom Movie, with the promise that Shurka and EES would equally split whatever return they received on the SOF Investment (the "Investment Agreement").

177.     Accordingly, in or around June 2023, Shurka, on behalf of himself and EES, signed the Private Placement Memorandum and accompanying Subscription Agreement ("PPM"), purchasing the membership interest.

178.     The Sound of Freedom movie was a sleeper hit at the box office, grossing over $250 million.

179.     In or around January 2024, Shurka informed EES through Bertolacini on a phone call that the parties had received 100% of their investment back. In other words, Shurka informed EES that the parties received their $500,000 investment back, but had not made any additional profit from their investment.

180.     Based on this representation, Bertolacini instructed Shurka to reinvest EES's $250,000 into UNIFYD's marketing efforts for EES's benefit.

181.     Bertolacini and EES did not independently verify the monies received by Shurka pursuant to the PPM because they trusted and relied upon Shurka's representations given the parties' personal and ongoing professional relationship.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

182. However, Plaintiffs are informed and believe that Shurka received substantially more monies pursuant to the PPM than Shurka had represented to EES.

183. Shurka has failed to provide evidence or accounting of actual money received pursuant to the PPM and/or information regarding the disposition of the proceeds of the investment returns.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract
### by EES Against Shurka and UNIFYD – Oral Agreement)

184. Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

185. Nevada law recognizes oral contracts between parties.

186. The Oral Agreement constitute(s) valid and enforceable contract(s), which are fully supported by consideration.

187. EES has fully performed its obligations under the Oral Agreement or was otherwise excused from performance.

188. The Oral Agreement required UH to, among other things, use the marketing dollars from EES exclusively for advertisements and other marketing efforts for EESystem sales.

189. Defendants breached the Oral Agreement when, among other things, they did not use the funds provided for marketing for EES, and instead diverted those funds to their own use, spending a substantial portion of the marketing funds on UTV.

190. Because of Defendants' failure to market for EES as required by the Oral Agreement, Defendants' have damaged EES.

191. EES has suffered damages as a result of Defendants' breaches of the Oral Agreement in an amount in excess of $15,000.00.

192. As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing**
**by EES Against Shurka and UNIFYD – Oral Agreement)**

193.     Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

194.     As alleged above, EES and UNIFYD and Shurka entered into a valid and enforceable Oral Agreement.

195.     Under Nevada law, every contract imposes upon the contracting parties the duty of good faith and fair dealing.

196.     UNIFYD and Shurka breached their duty of good faith and fair dealing to EES by performing in a manner that was unfaithful to the purpose of the Oral Agreement, including, without limitation, not using the funds provided for marketing for EES, and instead diverting those funds to its own use, largely on UTV, siphoning off EES's customers for itself, and launching a coordinated smear campaign to impugn the reputation, credibility, and character of EES, Bertolacini, and Dr. Michael in order to steal EES's customers, the very same customers for which EES had hired UNIFYD to market on EES's behalf, and to extort millions of dollars from EES.

197.     By reason of UNIFYD and Shurka's breach, EES has been denied its justified expectations under the Oral Agreement.

198.     By reason of UNIFYD and Shurka's breach of the implied covenant of good faith and fair dealing, and a direct and proximate result thereof, EES has been damaged in an amount in excess of $15,000.00.

199.     As a direct and proximate result of UNIFYD and Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

### THIRD CLAIM FOR RELIEF
**(Tortious Interference with Contractual Relations/Prospective Business Relations by EES Against Defendants)**

200.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

201.    Defendants are aware of EES' contractual relations and prospective business relations with its Centers across the globe.

202.    Defendants undertook the actions described herein, including the November 14 Email, Social Media Posts, and Presentation, with the specific intent and motive to disrupt EES' contractual relations with the Centers.

203.    As a result of Defendants' actions described above, EES' contractual relationship with customers have been disrupted and damaged, including, but not limited to, EES's customers cancelling their orders and requesting refunds at the direct instruction from and urging by Shurka.

204.    As a proximate and foreseeable result of Defendants' conduct, EES has suffered and continues to suffer damage and substantial losses in an amount to be determined at trial.

205.    Further, unless Defendants' conduct is enjoined, EES will suffer immediate and irreparable harm to its business through loss of the benefit of time, effort and expense spent to discover which Centers have been contacted and inform them of the falsity of the Defendants' statements. Accordingly, EES is entitled to injunctive relief against Defendants.

206.    Upon information and belief, Defendants acted willfully, wantonly, intentionally, with reckless misappropriate or disregard of the rights of EES, and/or with bad faith and/or malice in committing the acts alleged herein, in an effort to injure EES.

207.    As a direct and proximate result of Defendants' actions, EES has suffered damages, including but not limited to, compensatory, consequential, special damages in the form of attorneys' fees, and punitive damages, in an amount in excess of $15,000.00.

208.    As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### FOURTH CLAIM FOR RELIEF
### (Conversion
### by EES Against Shurka and UNIFYD)

209.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

210.   EES delivered in excess of $9 million to UNIFYD for use on marketing efforts to promote EES.

211.   Instead, UNIFYD converted at least $1.7 million of EES's money to use on its own marketing for matters unrelated to EES, and has exerted wrongful dominion over those funds, in denial of, inconsistent with, and in derogation of EES's rights and title to those funds.

212.   As a direct and proximate result of Defendants' actions, EES has suffered damages in an amount in excess of $15,000.00.

213.   As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute, this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment – in the Alternative
### by EES Against Shurka and UNIFYD)

214.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

215.   As a result of the conduct of Defendants outlined above, Defendants have been unjustly enriched to the detriment of EES.

216.   Defendants have appreciated, accepted, received, retained, and benefitted from the unauthorized use and retention of at least $1.7 million of EES's money.

217.   It would be inequitable for Defendants to retain the benefits of the foregoing without due compensation to EES.

218.   As a direct and proximate result of Defendants' actions, EES has suffered damages in an amount in excess of $15,000.00.

219.   As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

**SIXTH CLAIM FOR RELIEF**
**(Civil Conspiracy**
**by Plaintiffs Against Defendants)**

220.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

221.   Defendants, by acting in concert, agreed and intended to accomplish an unlawful objective for the purpose of harming Plaintiffs.

222.   Specifically, upon information and belief, Defendants planned and agreed to commit the acts underlying the several Claims for Relief stated herein, including, among other things, not using the funds provided for marketing for EES, and instead diverting those funds to its own use, largely on UTV, siphoning off EES's customers for itself, and launching a coordinated smear campaign to impugn the reputation, credibility, and character of EES, Bertolacini, and Dr. Michael in order to steal EES's customers, the very same customers for which EES hired UNIFYD to market on EES's behalf.

223.   Additionally, Defendants planned and agreed to further impugn the reputation, credibility, and character of EES, Bertolacini, and Dr. Michael by falsely accusing them of not creating the EESystem technology and, instead, improperly profiting off the invention of others.

224.   Defendants also planned and agreed to create a competing and infringing product to the EESystem, The Light System product, using the exact same technology as the EESystem offered at a lesser price, to siphon EES's customers.

225.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages in an amount in excess of $15,000.00.

226.   As a direct and proximate result of Defendants' actions and conduct, Plaintiffs have been forced to retain the services of an attorney to prosecute this action and, therefore, Plaintiffs are entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

26

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

227.   Plaintiffs are entitled to injunctive relief against Defendants to prevent further damage and harm to Plaintiffs.

### SEVENTH CLAIM FOR RELIEF
#### (Misappropriate of Trade Secrets (NRS Chapter 600A) by EES Against Defendants)

228.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

229.   EES' name, products, methods, and models have a reputation for excellent quality and service brought about by EES' expenditure of time, money, and effort to develop superior wellness technology and money for purchase across the country.

230.   By virtue of their relationship with EES, Defendants obtained access to confidential information regarding EES's "hyper charged" products and EES's systems and methods for hyper charging the products (the "Trade Secrets").

231.   When EES shared this information with Defendants, it did so under the express agreement and understanding that Defendants would maintain the confidentiality of the Trade Secrets.

232.   Instead, UNIFYD has unlawfully misappropriated or threatened to misappropriate, in the form of use or disclosure of the Trade Secrets of EES, including business models, methods, products, and proprietary information in the November 14th Email and Social Media Posts, and in other statements to third parties.

233.   This includes UNIFYD and Religa's creation of the competing and infringing product, The Light System technology.

234.   As a result of Defendants' false and deceiving statements, EES has been damaged by the need to expend time, expense, and energy to take corrective steps with its Centers to mitigate the effect of the false assertions made by Defendants in an amount to be determined at trial.

235.   EES will continue to suffer damage unless Defendants are enjoined from continuing to publicize information regarding its confidential and proprietary information.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

236.    Upon information and belief, Defendants acted willfully, wantonly, intentionally, with reckless misappropriate or disregard of the rights of EES, and/or with bad faith and/or malice in committing the acts alleged herein, in an effort to injure EES.

237.    As a direct and proximate result of Defendants' actions, EES has suffered damages, including but not limited to, compensatory, consequential, special and statutory damages in the form of attorneys' fees, punitive and exemplary damages, and statutory damages in an amount in excess of $15,000.00.

238.    As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

## EIGTH CLAIM FOR RELIEF
### (Trade Libel/Business Disparagement by EES Against Defendants)

239.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

240.    As set forth more fully above, Defendants represented to EES' Center(s) and customer(s), among other things,

   a.   "that EES has decided to open centers without approval/consent from UNIFYD Healing" and that this would lead to an "over-saturation" of Centers in one geographic area;

   b.   that EES is "planning to cut off their ad spend for centers worldwide";

   c.   that EES is "currently trying to build out their own version of UNIFYD Healing and take everything for themselves";

   d.   that "EESystem is making a profit margin of up to 400%+ on the merchandise they sell to center owners while making profit margins of up to 1,000% on technology sold to center owners";

   e.   that EES made "$100,000,000 in revenue in less than three years";

   f.   that "EESystem is currently planning to mandate all center owners to pay an annual licensing fee";

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

28

g.  that "EESystem is refusing to pay employees that rendered services for them while also withholding funds from about five center owners that they promised subsidies to as part of the subsidy program established earlier this year"; and

h.  that EESystem was not as advertised and the same products could be purchased elsewhere.

241.  Upon information and belief, these statements had the effect of causing EES' customers and Centers to believe that EES's products and offerings were less valuable than advertised or were inferior to other products and offerings.

242.  These statements were false and were made by Defendants to advance their own agenda to steal EES's customers and cause them to forego doing business with EES and to retaliate against EES for refusing to purchase UH for an exorbitant and unsupported price.

243.  Specifically,

a.  EES never granted authority to UNIFYD such that they had to consent to EES's sales to new Centers, and EES did not sell to any Centers other than UH Centers after the Press Release;

b.  EES had no plans to "cut off" ad spend;

c.  EES stands committed to providing support for the Centers that purchase EESystems, including finding ways to support marketing in house when UNIFYD failed to fulfill their obligations under the Center Agreements, and nothing in the Oral Agreement precludes EES from protecting its brand, reputation, or Center owners;

d.  Percentages of "profit margins" are entirely fabricated;

e.  Revenue figures are entirely fabricated;

f.  No mandate regarding licensing fees is mandated, nor would any license fee for EES technology be wrongful if EES considered implementing the same;

g.  EES has fulfilled its obligations and has not failed to pay employees; and

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

29

h. EES' products are as advertised and cannot be purchased elsewhere.

244.    Defendants also falsely implied that they would no longer be working with EES due to EES's "greed" and its mistreatment of the Centers.

245.    Additionally, The Presentation again contained numerous personal attacks on Bertalocini, Dr. Michael and EES, and made numerous false statements including:

   a. Putting "Doctor" in quotation marks, implying that Dr. Michael is not actually a doctor;

   b. that Dr. Michael "is not the original inventor" of EESystem and, instead, had stolen the invention from Robert J. Religa and used it for her own benefit;

   c. that Religa's "Synchronicity Engine" source code is the same as that used by the EESystem;

   d. that "EESystem's unlicensed use of [Religa's] original copyright has put center owners in jeopardy;

   e. that "[Dr. Michael'] story of how the [EESystem] technology came to her is fraudulent;" and

   f. implying that Dr. Michael and EES, along with its products, are somehow personally responsible for Religa's mental health and/or alleged suicide attempts.

246.    Specifically, Dr. Michael is Doctor of Natural Medicine, is the original inventor of the EESystem, and Synchronicity Engine is not the source code for EESystem.

247.    Upon information and belief, these statements had the effect of causing EES's customers and Centers to believe that Dr. Michael was not the true inventor of the EESystem and that EES has attempted to improperly profit off of another person's property.

248.    These statements were false and were made by Defendants to continue to advance their own agenda to steal EES's customers and cause them to forego doing business with EES and to retaliate against EES for refusing to purchase UH for an exorbitant and unsupported price.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

249. The statements made by Defendants to EES' customers and Centers were not subject to privilege.

250. Defendants made these statements knowing that they were false, or at least with negligent disregard of their falsity.

251. Upon information and belief, Defendants acted willfully, wantonly, intentionally, and/or with bad faith and/or malice in committing the acts alleged herein, in an effort to injure EES.

252. As a direct and proximate result of Defendants' false and deceiving statements, EES has suffered damages, including, without limitation, the loss of clients and the need to expend time, expense, and energy to take corrective steps with its customers and Centers to mitigate the effect of the false assertions made by Defendants to EES' customers and clients, and is entitled to damages, including but not limited to, compensatory, consequential, special damages in the form of attorneys' fees, and punitive and exemplary damages, in an amount to be determined at trial (exceeding $15,000).

253. The Court should also preliminarily and permanently enjoin Defendants from further trade libel/business disparagement of EES.

254. As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### NINTH CLAIM FOR RELIEF
**(Trade Name Infringement\
by EES Against Defendants)**

255. Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

256. EES has a protectible right in the "EESystem."

257. As set forth more fully above, Defendants represented to EES' customer(s) and Center(s) that, among other things, they equally own the EESystem with EES.

258. For example, in the November 14th Email and Social Media Posts, Shurka implied that UH has autonomy over who can purchase the EESystem.

31

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

259.   In the Presentation, Defendants implied that they have the rightful use of EESystem and that they were essentially rebranding EESystem as The Light System.

260.   Upon information and belief, Defendants have been unlawfully using the EESystem trade name for its own benefit, to the confusion of customers and Centers.

261.   Therefore, Defendants have unlawfully infringed on EES' trade name "EESystem."

262.   Upon information and belief, Defendants acted willfully, wantonly, intentionally, and/or with bad faith and/or malice in committing the acts alleged herein, in an effort to injure EES.

263.   As a direct and proximate result of Defendants' false and deceiving statements, EES has suffered damages, including, without limitation, the loss of clients and the need to expend time, expense, and energy to take corrective steps with its customers and Centers to mitigate the effect of the false assertions made by Defendants to EES' customers and Centers, and is entitled to damages, including but not limited to, compensatory, consequential, special damages in the form of attorneys' fees, and punitive and exemplary damages, in an amount to be determined at trial (exceeding $15,000).

264.   The Court should also preliminarily and permanently enjoin Defendants from further trade name infringement of EES.

265.   As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

**TENTH CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation**
**by EES Against Defendants) [3]**

266.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

_____

[3] This information is within Defendants' control, and once Plaintiffs are able to obtain more information in discovery, they will be able to supplement the allegations relating to this fraudulent misrepresentation claim.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

267.    In or around May 2022 and throughout the parties' negotiations into March 2024, Shurka and UNIFYD made several misrepresentations to EES including, among other things about the health and success of UNIFYD, that the funds expended by EES for the marketing budget would be spent exclusively on marketing efforts for EES's benefit, and that UNIFYD would help EES grow and assist with its relationship with the Centers.

268.    Shurka also misrepresented that he was a spokesperson for and directly aligned with TLS.

269.    Shurka made these representations to EES in person at Dr. Michael's residence on May 21, 2022 in Las Vegas, and on phone calls, text and WhatsApp messages, and in letters and other correspondence many times over the course of the parties' relationship.

270.    Upon information and belief, Defendants knew and believed that these representations were false when made, or had an insufficient basis of information for making the representations. Specifically, Defendants made the representations to induce EES to provide millions of dollars that Shurka used for his own personal interests in UNIFYD TV, entirely unrelated to EES's or the Centers' business.

271.    Upon information and belief, Defendants made the representations to induce EES to agree to spend millions in marketing budget and to subsidize UNIFYD's payroll without the any protections memorialized in writing.

272.    Upon information and belief, the representations were false in many ways, including without limitation:

      a.  UNIFYD is not as successful as Shurka represented;

      b.  UNIFYD did not use marketing funds for the benefit of EES and the Centers, as agreed, instead diverting those funds to benefit UTV;

      c.  UNIFYD abused its position of trust with EES and the Centers, instead attempting to destroy the trust and goodwill between EES and the Centers; and

      d.  Either TLS does not exist, or Shurka is not affiliated with TLS, or both.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

273. Because Shurka was a successful influencer and had gained Bertolacini's trust and reliance by building a personal relationship with Bertolacini and his family, including Dr. Michael, by affiliating himself with TLS, EES justifiably relied on Defendants' misrepresentations.

274. Additionally, Shurka sent the Coercion Letters purportedly from TLS putting pressure on EES to, among other things, make the Center Agreements mandatory for all sales of EESystems, such that all Centers purchasing products from EES would be required to enter into Center Agreements with UNIFYD.

275. EES received letters from TLS whenever they disagreed, or questioned, Shurka's or UNIFYD's conduct and commitment to TLS.

276. These letters all criticized EES for expressing any doubt in UNIFYD and Shurka and touted and exaggerated UNIFYD and Shurka's contributions to TLS.

277. But the metadata contained on one such letter revealed that it was, in fact, authored by Shurka.

278. Therefore, upon information and belief, all letters received by EES from TLS were actually authored by Shurka.

279. It was not until EES was able to see the metadata on this letter that it became aware of Defendants' misrepresentations.

280. Defendants knew and believed that these representations were false when made, or had an insufficient basis of information for making the representations as Shurka himself drafted them, claiming to be sent on behalf of TLS, and using the imprimatur of TLS to induce EES to rely on their representations.

281. Defendants made these representations to induce Plaintiffs to agree, among other things, to make the Center Agreements mandatory, to prevent EES from investigating into UNIFYD's use of EES funds, and to induce EES to purchase UH for an exorbitant and un-supported price.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

282.   Because EES believed in TLS and its purported mission, and believed Shurka to be TLS' public spokesperson, it justifiably relied on Defendants' representation that TLS authored the various letters.

283.   As a direct and proximate result of Defendants' conduct, EES has suffered and will continue to suffer damages in an amount to be proven at trial, in excess of $15,000.

284.   Defendants' fraudulent representations and conduct designed to induce EES to form a business relationship with UNIFYD and Shurka were fraudulent, malicious, and oppressive, thereby entitling EES to recover punitive damages in an amount to be determined at trial.

285.   As a direct and proximate result of Defendants' actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

**ELEVENTH CLAIM FOR RELIEF**
**(Defamation/Defamation *Per Se***
**by Plaintiffs Against Defendants)**

286.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

287.   As set forth more fully above, Defendants represented to Plaintiffs' Center(s) and customer(s), among other things, that EES, Bertolacini, Dr. Michael, and their family are greedy, liars, do not care about the Centers, and denigrating their motives, reputations, character, and morals.

288.   As set forth more fully above, Defendants represented to EES' Center(s) and customer(s), among other things:

    a.   "that EES has decided to open centers without approval/consent from UNIFYD Healing" and that this would lead to an "over-saturation" of Centers in one geographic area;

    b.   that EES is "planning to cut off their ad spend for centers worldwide";

    c.   that EES is "currently trying to build out their own version of UNIFYD Healing and take everything for themselves";

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

d. that "EESystem is making a profit margin of up to 400%+ on the merchandise they sell to center owners while making profit margins of up to 1,000% on technology sold to center owners";

e. that EES made "$100,000,000 in revenue in less than three years";

f. that "EESystem is currently planning to mandate all center owners to pay an annual licensing fee";

g. that "EESystem is refusing to pay employees that rendered services for them while also withholding funds from about five center owners that they promised subsidies to as part of the subsidy program established earlier this year";

h. that EESystem was not as advertised and the same products could be purchased elsewhere.

i. that Dr. Michael was not a doctor;

j. that Dr. Michael was not the original inventor of the EESystem and, instead, had stolen the invention from Religa and used it for her own benefit;

k. that Religa's "Synchronicity Engine" source code is the same as that used by the EESystem;

l. that "EESystem's unlicensed use of [Religa's] original copyright has put center owners in jeopardy;

m. that "[Dr. Michael'] story of how the [EESystem] technology came to her is fraudulent;" and

n. implying that Dr. Michael and EES are somehow personally responsible for Religa's mental health and/or alleged suicide attempts.

289.    These statements had the effect of harming Plaintiffs' character and reputation.

290.    Defendants also falsely implied that they would no longer be working with Plaintiffs due to EES and the Bertolacini family's "greed" and its alleged mistreatment of the Centers.

291.    These statements were false and were made by Defendants to advance their own agenda to steal EES's customers and cause them to forego doing business with Plaintiffs and to retaliate against Plaintiffs for refusing to purchase UH for an exorbitant and unsupported price.

292.    The false statements include, without limitation, the following:

    a.  EES never granted authority to UNIFYD such that they had to consent to EES's sales to new Centers, and EES did not sell to any Centers other than UH Centers after the Press Release;

    b.  EES had no plans to "cut off" ad spend;

    c.  EES stands committed to providing support for the Centers that purchase EESystems, including finding ways to support marketing in house when UNIFYD failed to fulfill their obligations under the Center Agreements, and nothing in the Oral Agreement precludes EES from protecting its brand, reputation, or Center owners;

    d.  Percentages of "profit margins" are entirely fabricated;

    e.  Revenue figures are entirely fabricated;

    f.  No mandate regarding licensing fees is mandated, nor would any license fee for EES technology be wrongful if EES considered implementing the same;

    g.  EES has fulfilled its obligations and has not failed to pay employees;

    h.  EES' products are as advertised and cannot be purchased elsewhere;

    i.  Dr. Michael is Doctor of Natural Medicine; and

    j.  Dr. Michael is the original inventor of the EESystem.

293.    The statements made by Defendants to EES' customers and Centers were not subject to privilege.

294.    Defendants made these statements knowing that they were false, or at least with negligent disregard of their falsity.

295.    Upon information and belief, Defendants acted willfully, wantonly, intentionally, and/or with bad faith and/or malice in committing the acts alleged herein, in an effort to injure Plaintiffs.

296.    As a direct and proximate result of Defendants' false and deceiving statements, Plaintiffs have suffered damages, including, without limitation, the loss of clients and the need to expend time, expense, and energy to take corrective steps with its customers and Centers to mitigate the effect of the false assertions made by Defendants to Plaintiffs' customers and clients, and is entitled to damages, including but not limited to, compensatory, consequential, special damages in the form of attorneys' fees, and punitive and exemplary damages, in an amount to be determined at trial (exceeding $15,000).

297.    The Court should also preliminarily and permanently enjoin Defendants from further defamation of Plaintiffs.

298.    As a direct and proximate result of Defendants' actions and conduct, Plaintiffs have been forced to retain the services of an attorney to prosecute this action and, therefore, Plaintiffs are entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### TWELFTH CLAIM FOR RELIEF
### (Breach of Contract by EES Against Shurka – Investment Agreement)

299.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

300.    Nevada law recognizes oral contracts between parties.

301.    The Investment Agreement constitutes a valid and enforceable contract, that is fully supported by consideration.

302.    EES has fully performed its obligations under the Investment Agreement or was otherwise excused from performance.

303.    The Investment Agreement required Shurka to, among other things, split the money received pursuant to the PPM equally.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

304.   Shurka breached the Investment Agreement when, among other things, he misrepresented the monies received from the PPM and failed to provide EES with an accounting or evidence of the monies received.

305.   Because of Shurka's failure to accurately represent the money received pursuant to the PPM as required by the Investment Agreement, Shurka has damaged EES and has deprived EES of its monies pursuant to the Investment Agreement.

306.   EES has suffered damages as a result of Shurka's breaches of the Investment Agreement in an amount in excess of $15,000.00.

307.   As a direct and proximate result of Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### THIRTEENTH CLAIM FOR RELIEF
**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing by EES Against Shurka – Investment Agreement)**

308.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

309.   The Investment Agreement is a valid and binding contract between EES and Shurka.

310.   Under Nevada law, a covenant of good faith and fair dealing inheres in every contract, including the Investment Agreement.

311.   Shurka owed a duty of good faith to EES arising from the Investment Agreement.

312.   A special element of reliance or fiduciary duty existed between Shurka and EES where Shurka was in an entrusted position as EES's business partner with control over the SOF Investment.

313.   Shurka breached the duty of good faith by engaging in misconduct, including misrepresenting the amount of monies Shurka received pursuant to the PPM and other actions unfaithful to the purpose of the Investment Agreement.

314.   EES has suffered damages as a result of Shurka's breaches of the Investment Agreement in an amount in excess of $15,000.00.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

315.    Because Shurka's breach was willful, fraudulent, malicious and oppressive, and designed to gain additional unwarranted benefit from his interference, EES is entitled to an award of punitive and exemplary damages in excess of $15,000.00.

316.    As a direct and proximate result of Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### FOURTEENTH CLAIM FOR RELIEF
**(Unjust Enrichment – in the Alternative by EES Against Shurka)**

317.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

318.    As a result of the conduct of Shurka outlined above, Shurka has been unjustly enriched to the detriment of EES.

319.    Shurka has appreciated, accepted, received, retained, and benefitted from the unauthorized retention of EES's money rightfully received pursuant to the Investment Agreement and the PPM.

320.    It would be inequitable for Shurka to retain the benefits of the foregoing without due compensation to EES.

321.    EES has suffered damages as a result of Shurka's breaches of the Investment Agreement in an amount in excess of $15,000.00.

322.    As a direct and proximate result of Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

### FIFTEENTH CLAIM FOR RELIEF
**(Breach of Confidential Relationship/Constructive Fraud by EES Against Shurka)**

323.    Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

324.   Shurka held a position of a confidential relationship of trust and reliance to EES, as he and UNIFYD were responsible for managing EES funds and coordinating EES's marketing efforts.

325.   Additionally, Shurka held a position of a confidential relationship of trust and reliance to EES, as EES entrusted him to make the SOF Investment and apportion the return according to the parties' Investment Agreement.

326.   By virtue of the confidential relationship, Shurka had a duty to apportion any monies received pursuant to the PPM equally between the parties and to render true and full information of all things affecting the SOF Investment upon demand.

327.   Shurka is in breach of his confidential relationship owed to EES and has engaged in constructive fraud by misrepresenting the monies received pursuant to the SOF and by failing to provide any accounting, documentation, or information regarding the monies received pursuant to the PPM and/or the disposition of such funds. As a direct and proximate result of Shurka's conduct, EES has suffered and will continue to suffer damages in an amount to be proven at trial, in excess of $15,000.

328.   As a direct and proximate result of Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

**SIXTEENTH CLAIM FOR RELIEF**
**(Accounting by EES Against Shurka)**

329.   Plaintiffs repeat and reallege the allegations of all preceding paragraphs by reference, as though fully set forth therein.

330.   EES and Shurka were partners pursuant to the Investment Agreement, in that they split one membership share, and pursuant to their partnership with regard to UNIFYD and Shurka's involvement in and with EES.

331.   A confidential and/or fiduciary relationship existed between EES and Shurka, as evidenced by the fact that Shurka and UNIFYD were in charge of EES's marketing and were entrusted with EES funds.

41

332.    Accordingly, the relationship between EES and Shurka was founded in trust and confidence.

333.    Shurka had a duty to render an accounting to EES to determine damages resulting from any misallocation of funds received by Shurka pursuant to the PPM.

334.    Shurka is in breach of this duty owed to EES by failing to provide any accounting, documentation or information regarding the monies received pursuant to the PPM and/or the disposition of such funds.

335.    As a result of Shurka's breach, EES is entitled to an accounting of all funds received by Shurka pursuant to the PPM and from the SOF Investment and/or the disposition of such funds.

336.    In addition, as a direct and proximate result of Shurka's actions and conduct, EES has been forced to retain the services of an attorney to prosecute this action and, therefore, EES is entitled to reasonable attorney's fees, costs and interest as damages in this action pursuant to Nevada law.

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants granting the following relief:

a)      A preliminary injunction and permanent injunction, enjoining Defendants from publishing EES' confidential and proprietary information, making defamatory statements regarding Plaintiffs, and taking action specifically intended to harm Plaintiffs;

b)      Money damages, including, but not limited to, compensatory damages, consequential damages, special damages in the form of attorneys' fees, punitive and exemplary damages, statutory damages, and/or restitution or disgorgement, in an amount proved at trial (in excess of $15,000);

c)      In the alternative, recission of the Oral Agreement and disgorgement and return of all monies paid to or on behalf of Defendants thereunder;

d)      A full and complete accounting of the receipt, use, and disposition of all funds received by Shurka pursuant to the PPM and from the SOF Investment and/or the disposition of such funds;

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

42

e)      In the alternative, recission of the PPM and disgorgement and return of all monies paid to or on behalf of Defendants thereunder;

f)      Contractual and/or statutory pre- and post-judgment interest;

g)      Costs of suit and attorneys' fees; and

h)      Any further relief this Court deems just and equitable.

DATED this 16th day of January 2025.

HOLLAND & HART LLP

/s/ Robert J. Cassity
Robert J. Cassity
Joseph G. Went
Sydney R. Gambee
Caitlan J. McMasters
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nv 89134

*Attorneys for Energy Enhancement System, LLC, Michael Bertolacini, and Dr. Sandra Rose Michael, DNM*

33679635_v19

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134